UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| WILLIAM RANDALL MCDONNELL,<br><br>*Plaintiff*,<br><br>v.<br><br>SOLSTICE PRODUCTIONS, LLC, a Missouri limited liability company,<br><br>*Defendant*. | Civil No.<br><br>**PLAINTIFF REQUESTS A TRIAL BY JURY** |

## COMPLAINT

COMES NOW, Plaintiff WILLIAM RANDALL MCDONNELL ("Plaintiff" or "Mr. McDonnell"), by and through his undersigned counsel, and herby complains and alleges against the above-named Defendant, based upon knowledge, information and a reasonable belief derived therefrom, as follows:

### PARTIES

1. Plaintiff, William Randall McDonnell, is currently a resident of the State of Nevada.

2. Defendant, Solstice Productions, LLC ("Solstice"), is a Missouri limited liability company with its principal place of business in St. Louis, Missouri.

### VENUE & JURISDICTION

3. Subject matter jurisdiction is invoked pursuant to 28 U.S.C. § 1332 (diversity of citizens) because the amount in controversy exceeds $75,000.00, and the parties are diverse. This Court has personal jurisdiction over the parties because, *inter alia*, Defendant is located in the Eastern District of Missouri.

1

4. Venue is proper in the Eastern District of Missouri pursuant to 28 U.S.C. § 1391(b) in that the claims arose in this district, and Defendant is located in this district.

5. Costs and attorney's fees are sought.

## GENERAL FACTUAL ALLEGATIONS

6. Mr. McDonnell is a member of an esteemed American aviation family, the McDonnells of McDonnell Douglas and St. Louis, Missouri, and is the holder of numerous patents for his inventions in aircraft, reusable rocket and other technology.

7. Mr. McDonnell prides himself on innovation for the greater good, including ideas for political reform and solutions to pandemics and other widespread ailments such as flu and common cold.

8. To that end, Mr. McDonnell created the concept of "Vote Best Option," an idea for political reform by which citizens vote for the challenger and unseat the incumbent if they do not reform our political system.

9. The goal behind "Vote Best Option" was to force incumbent and career politicians to focus less on big dollar donors and maintaining their seat and to focus more on the Americans they represent through a mechanism such as a website for voters and panel recommendations.

10. The envisioned website would allow voters to input their state and congressional district, and the website would provide information about which candidate to vote for, based on each incumbent or candidate's track record of working on special interests to the detriment of the American people and willingness to make a commitment to unify the country in the future.

11. Mr. McDonnell also conceptualized a panel he called, "We the People's Supreme Court." During each election season, nine individuals from the Reader's Digest 100 Most Trusted Americans would be asked to recommend which congressmen to re-elect and which to vote out

based on each incumbent's commitment to pulling the country back together and maximizing benefits to the American people.

12. A different group of nine "Most Trusted Americans" would serve on the "We the People's Supreme Court" in each election cycle, and their recommendations would be published to the American people before each election.

13. These concepts were the vision behind "Vote Best Option," and Mr. McDonnell wanted to share them with and promote them to the American people, in large part through the involvement of individuals from the Most Trusted Americans list.

14. He began discussions with Amanda Aschinger ("Ms. Aschinger"), Chief Executive Officer of Solstice, about how to disseminate and promote these ideas.

15. Ms. Aschinger suggested that the way to promote Mr. McDonnell's ideas was with a documentary film, and she represented to Mr. McDonnell that she had the ability to obtain interviews with individuals from the Reader's Digest 100 Most Trusted Americans list, especially Skype interviews during this pandemic, and bring them into the film.

16. Both parties understood that the involvement of these individuals was central to Mr. McDonnell's goal and the envisioned documentary.

17. Ms. Aschinger further assured Mr. McDonnell that she could produce a documentary film that would effectively disseminate Mr. McDonnell's ideas for political reform. Ms. Aschinger stated that the media loved documentaries and short videos because it was free content for increased advertising revenue.

18. On May 7, 2020, Solstice and Mr. McDonnell entered into a written contract for the production of the contemplated full-length feature documentary and 80-100 short videos in support of the "Vote Best Option" concept.

19. Mr. McDonnell paid Solstice $78,015 to fund the production of this documentary.

20. In return, Ms. Aschinger was tasked with producing the short films and the documentary to disseminate Mr. McDonnell's ideas, including by obtaining interviews from individuals on the Most Trusted Americans list.

21. Following execution of the contract, Mr. McDonnell and Ms. Aschinger went through the list of the Reader's Digest 100 Most Trusted Americans and identified numerous individuals to pursue for interviews.

22. Despite her representation and knowledge that the involvement of these individuals was central to the documentary Mr. McDonnell was pursuing, Ms. Aschinger failed to obtain any interviews from any individual on the Reader's Digest 100 Most Trusted Americans list and, in fact, failed to get any interviews with any commonly known individual.

23. Further, the documentary Ms. Aschinger ultimately produced did not include the approach to achieve political reform that was Mr. McDonnell's primary purpose in pursuing the documentary.

24. Ms. Aschinger explained that her failure to include Mr. McDonnell's desired approach to political reform in the documentary was due to Solstice's desire to get the documentary to air on Amazon Prime with whom Solstice arranged to stream the documentary because Amazon would not show a documentary that was "too controversial."

25. As a result, the final documentary was not of the content and quality discussed when the parties entered into the contract and ultimately failed to fulfill the contract's central purpose of producing a documentary to disseminate Mr. McDonnell's ideas regarding reformation of the country's political system.

///

## FIRST CAUSE OF ACTION

### *FRAUDULENT MISREPRESENTATION*

26. Each of the allegations set forth in paragraphs 1 through 25, inclusive, are hereby incorporated by this reference as if realleged fully herein.

27. To entice Mr. McDonnell into entering into a contract to produce a documentary with Solstice, Ms. Aschinger represented to Mr. McDonnell that she had the ability to obtain interviews with individuals on the Reader's Digest 100 Most Trusted Americans list.

28. However, Ms. Aschinger did not in fact have, and knew that she did not have, the connections necessary or ability to obtain interviews with those individuals.

29. At the time she made the misrepresentation to Mr. McDonnell, Ms. Aschinger knew that obtaining interviews with these individuals was central to Mr. McDonnell's plan to promote his ideas through this documentary, and she intended Mr. McDonnell to rely on her representation in entering into a contract with Solstice.

30. Mr. McDonnell was entitled to rely, and in fact did rely, on Ms. Aschinger's representation in selecting Solstice to assist him in disseminating his ideas, and he did not and could not know that such representation was false.

31. As a result of Ms. Aschinger's misrepresentation, Mr. McDonnell suffered damages including, but not limited to, the $78,015 he paid to Solstice.

## SECOND CAUSE OF ACTION

### *BREACH OF CONTRACT*

32. Each of the allegations set forth in paragraphs 1 through 31, inclusive, are hereby incorporated by this reference as if realleged fully herein.

33. Mr. McDonnell and Solstice entered into a contract for the production of multiple short films and, more centrally, a longer documentary.

34. The purpose of the documentary was to disseminate Mr. McDonnell's ideas and calls for political reform, in significant part through interviews with individuals from the Reader's Digest 100 Most Trusted Americans list.

35. Mr. McDonnell paid Solstice $78,015 for the production of this documentary.

36. The documentary produced by Solstice failed to fulfill the material terms and central goal of the contract, and Solstice's performance was substantially defective for reasons including, but not limited to, Ms. Aschinger's failure to obtain any interviews with any individuals from the Reader's Digest 100 Most Trusted Americans list and her failure to include Mr. McDonnell's approach to political reform in the documentary.

37. As a result of Solstice's breach of the contract, Mr. McDonnell suffered damages including, but not limited to, the $78,015 he paid to Solstice.

## THIRD CAUSE OF ACTION

### *UNJUST ENRICHMENT*

38. Each of the allegations set forth in paragraphs 1 through 37, inclusive, are hereby incorporated by this reference as if realleged fully herein.

39. Mr. McDonnell has paid $78,015 to Solstice, as well as provided the creative basis of the documentary and contributed his time to the production of the short films and documentary in numerous forms, including through interviews for the films.

40. Solstice has accepted and retained such payments and used some of those funds to produce a documentary film that was not in accordance with Mr. McDonnell's vision or the parties'

agreement and did not advance Mr. McDonnell's Vote Best Option or other ideas for political reform.

41. Solstice further used Mr. McDonnell's ideas and vision to recruit the participation of other individuals and organizations, included interviews with Mr. McDonnell in the films and used Mr. McDonnell's ideas regarding the source of problems in the current political system to produce the film that Solstice and Ms. Aschinger, rather than Mr. McDonnell, wanted to produce.

42. Following completion of the film, Solstice arranged for distribution of the film to several streaming sites, including Amazon.com, and receives payments from such sites, and thus Solstice has benefited professionally and financially from the documentary, and Mr. McDonnell's funds, time and ideas.

43. Allowing Solstice to retain Mr. McDonnell's payments and the benefits of his time and ideas under the circumstances would be unjust and inequitable.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Mr. McDonnell demands a jury trial for all issues in this matter.

## **RELIEF REQUESTED**

WHEREFORE, Mr. McDonnell prays that this Honorable Court enter judgment in his favor, and against the Defendant, Solstice Productions, LLC, for (i) general and compensatory damages and/or restitution in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS

($75,000.00); (ii) for costs and reimbursement of the full amount of Mr. McDonnell's attorney's fees available under contract and law; and (iii) further relief as justice requires.

DATED this 3rd day of March, 2021.

Respectfully Submitted,

**THE BACH LAW FIRM, LLC**

    */s/ Jason J. Bach*
Jason J. Bach
*Pro Hac Vice Admission Pending*
7881 West Charleston Blvd., Suite 165
Las Vegas, Nevada 89117
Telephone: (702) 925-8787
Facsimile: (702) 925-8788
Email:  jbach@bachlawfirm.com
*Attorney for Plaintiff*